UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD THOMAS, ) | 1:05-CV-1236 LJO JMD HC |
| Petitioner, ) | |
| ) | FINDINGS AND RECOMMENDATION |
| v. ) | REGARDING PETITION FOR WRIT OF |
| ) | HABEAS CORPUS |
| JEANNE WOODFORD, Warden, ) | |
| ) | ORDER DIRECTING CLERK OF COURT |
| Respondent. ) | TO CHANGE NAME OF RESPONDENT |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Fresno County Superior Court. On October 31, 2001, Petitioner was convicted by jury of murder (Cal. Penal Code § 187(a)), two counts of first-degree residential burglary (Cal. Penal Code §§ 459, 460(a)), witness intimidation (Cal. Penal Code § 137(b)), and vehicle theft (Cal. Vehicle Code § 10851(a)). (Answer at 4.) It was further found that Petitioner personally discharged a firearm in the commission of the murder (Cal. Penal Code §§ 12022.5(a), 12022.53(d)). (Id.) On December 5, 2001, the court sentenced Petitioner to a term of forty years to life plus seven years. (Id.)

On December 14, 2002, Petitioner appealed to the California Court of Appeal. On May 19,

2003, the court ordered that the first-degree burglary convictions be reduced to second-degree burglary, but otherwise affirmed the judgment. (Answer at 4-5; Lodged Doc. 4.)

Petitioner then filed a petition for review in the California Supreme Court. On July 23, 2003, the court denied the petition. (Answer at 5; Lodged Doc. 5.)

On August 20, 2003, Petitioner filed a petition for writ of habeas corpus in the Fresno County Superior Court. On August 29, 2003, the court denied the petition. (Lodged Doc. 6.)

On May 3, 2004, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal. On May 13, 2004, the court denied the petition. (Lodged Doc. 7.)

On June 1, 2004, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court. On April 27, 2005, the court denied the petition. (Lodged Doc. 8.)

On September 29, 2005, Petitioner filed the instant petition in this Court. The petition raises the following four grounds for relief: 1) the trial court erred in failing to instruct the jury that Victoria Franklin was an accomplice as a matter of law; 2) insufficient evidence to support Petitioner's convictions for first-degree burglary; 3) denial of due process and effective assistance of counsel when counsel failed to make specific objections at trial; and 4) denial of due process when Petitioner was improperly sentenced on a firearm enhancement as to the witness intimidation charge.

On April 3, 2006, Respondent filed an answer to the petition.

On May 24, 2006, the Court issued a Findings and Recommendation recommending that grounds three and four be dismissed with prejudice. (Court Doc. 14.) On June 30, 2006, Petitioner filed objections to the Findings and Recommendation. (Court Doc. 15.) On July 31, 2006, the Court adopted the Findings and Recommendation, dismissing grounds three and four of the petition. (Court Doc. 16.)

**FACTUAL BACKGROUND**[1]

<u>Victoria Franklin's testimony</u>

John Sheehan met Victoria Franklin while she was working as a prostitute. Franklin and Sheehan saw each other regularly and she was frequently at his house. Petitioner was Franklin's

---

[1] The facts are derived from the factual summary set forth by the California Court of Appeal in its opinion of May 19, 2003 and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1); Lodged Doc. 4.

boyfriend during the time she and Sheehan were seeing each other.

On the morning of Saturday, January 6, 2001, Franklin was at Sheehan's house on one of her regular visits when she received a page from Petitioner.  She called him back and Sheehan asked who she was speaking to.  Franklin replied she was speaking to her "brother" and Sheehan asked to meet him.  Franklin handed the telephone to Sheehan, and he invited Petitioner to come over to his house.

Petitioner got a ride to Sheehan's house from his codefendant Tommy Laws.  Franklin, Sheehan, and Petitioner watched television, drank beer, and ate dinner.

The following day, Franklin, Sheehan, Petitioner, and Laws watched a football game at Sheehan's house and drank alcohol.  When Sheehan went to work, the others remained at his house where they listened to music, drank alcohol, and used the spa.  Around 5:00 p.m., after Laws had left, Sheehan arrived at the house and began preparing hamburgers on the barbeque.  Petitioner joined Sheehan on the patio where they drank alcohol.  At some point prior to dinner, Sheehan used the racial epithet "nigger" while he talked to Petitioner.  Franklin testified that Petitioner did not seem upset by the remark.

Franklin testified they ate dinner together and everything appeared calm.  Petitioner and Sheehan sat in the living room while Franklin cleaned the kitchen.  Petitioner and Sheehan talked about martial arts and demonstrated karate moves to each other.  They were just "playing around" and did not hit each other.  Sheehan went into the bedroom, returned with his nine-millimeter handgun, and tossed it to Petitioner.  Petitioner looked it over and said it was nice.  Franklin asked Sheehan to put the gun away, and Sheehan placed it on a table.  Petitioner said he wanted to talk with Sheehan outside.  Petitioner and Sheehan went to the patio while Franklin remained inside and watched television.  Franklin eventually went to the patio door to see what they were doing.  Petitioner and Sheehan were standing by the pool, and Sheehan was talking about how long he had lived in the house.  Sheehan also told Petitioner how much he liked Franklin.  Franklin returned to the couch and watched television.

About 10 minutes later, Franklin suddenly heard "a big thumping sound on the glass door."  She went outside and found Sheehan bleeding from the head and holding the wound with a towel.

Petitioner was standing next to him.  Sheehan was "bleeding really bad" and the blood was "[o]n top of his head, and it was dripping down his face."  Franklin asked Petitioner what happened, but he did not respond.  Sheehan kept saying it was okay, but Franklin said it was not okay and again asked what happened.  Sheehan replied that Petitioner hit him with a beer bottle.  Franklin testified that Petitioner said that everything was alright and that he had hit Sheehan because he disrespected him by using the "N-word."

Franklin testified that Petitioner directed her to clean the blood from the patio.  Franklin found a broom, dipped it in the pool, and tried to brush off the blood.  Franklin was still upset and repeatedly asked Petitioner why he hit Sheehan.  Petitioner became angry and pushed Franklin into the pool.  The water was very cold and she quickly got out, went into the master bedroom, and changed clothes.

Franklin rushed back to the patio but she stopped and picked up Sheehan's gun, which was still on the table in the house.  She put the gun in the waistband of her shorts because she wanted to keep the weapon away from the men.  She covered the gun with her long T-shirt and returned to the patio where Sheehan and Petitioner were still standing.  Sheehan asked Petitioner if he could go inside and clean up because his shirt was covered with blood.  Petitioner agreed but closely followed Sheehan into the house.  Franklin also followed them, and testified that Petitioner rushed behind Sheehan to catch up with him.

Sheehan went into his bedroom and headed for the closet to get another shirt.  Petitioner seemed suspicious and said, "I hope that you're not trying to get nothing besides your shirt."  Franklin felt the gun slip from her waistband, so she placed it on the counter in the adjoining bathroom and stood next to it.  Franklin testified that Petitioner told Sheehan, "You know what, fuck this. I'm going to go ahead and tie you up.  I want you to go sit on the chair."  Petitioner then directed Sheehan to a chair in the corner of the room.  Franklin remained next to the gun and asked Petitioner why he was doing all this.  Petitioner repeatedly told her to shut up.  Franklin described Sheehan as being in shock.  Sheehan was still wearing the bloody shirt, and slowly walked to the chair and sat down.  Petitioner tied him to the chair using a pair of handcuffs and a towel or shirt.  Sheehan asked Petitioner why he was doing this and Petitioner told him to shut up.

After Petitioner tied up Sheehan, he saw the gun on the bathroom counter and told Franklin to give it to him. She refused and they argued for several minutes. Petitioner was "really mad" and wanted the gun, and said, "Give me the gun, bitch. Just give me the gun." As Franklin continued to argue with Petitioner about the gun, she noticed that Sheehan was getting loose from the chair. Franklin testified she had seen the handcuffs in the bedroom on a previous occasion, and she knew they were fake. Sheehan untied himself and started to walk toward Franklin and Petitioner. However, Petitioner saw Sheehan's reflection in the mirror and grabbed the gun from Franklin's hands. Franklin testified that Petitioner "turned around and he faced John, and John put up his hands and he was--kept saying, "No, T-Bone. No, T-Bone."

Franklin testified Petitioner faced Sheehan and shot him once in the chest. Sheehan went back a few steps and fell down. Franklin was screaming and crying, and repeatedly asked Petitioner why he had to shoot him. Petitioner told Franklin to shut up and not worry about it. Franklin believed Petitioner shot Sheehan around 8:00 or 9:00 p.m.

Franklin testified that Sheehan was on his back, groaning in pain and holding his chest, but he was unable to talk. Franklin tried to run into the living room but Petitioner said, "You stay right here, bitch. You stay right here." Petitioner approached Sheehan and stomped his chest near the gunshot wound about four times. After Petitioner stomped Sheehan, he noticed the floor safe in the closet and asked Franklin about it, and she replied it was empty. Petitioner went back to Sheehan, placed the gun to Sheehan's mouth, and asked for the safe's combination. Sheehan did not reply and Franklin was not sure if he was even able to speak.

Petitioner told Franklin to sit by Sheehan. Franklin unsuccessfully tried to resuscitate him. Petitioner then leaned down and removed a ring from Sheehan's finger, put it on, and commented that it looked better on him. Franklin went into the living room and Petitioner followed her. He unplugged all the telephones in the house and said she better not try to go anywhere or call anyone. Petitioner warned Franklin she would be an accessory to murder if she told anyone.

About an hour after Petitioner killed Sheehan, he told Franklin they were going to spend the night at Sheehan's house. Petitioner still had the handgun. He got a blanket and told Franklin to sleep with him on the living room floor by the fireplace. Before they went to sleep, Petitioner said

"If you try to get up or anything, I'll shoot you with this gun, and you'll be here dead with John." Franklin testified she wanted to leave, but Petitioner would follow her whenever she got up.

On Monday, January 8, Petitioner and Franklin woke up around 6:30 or 7:00 a.m. and took Sheehan's car to get Laws. Petitioner kept the handgun in his waistband. Franklin was alone in the car while Petitioner went to the door to get Laws, but she was too afraid to drive away. Petitioner, Franklin, and Laws returned to Sheehan's house where they moved the body to the back bedroom and attempted to clean up any fingerprints left in the house. They then began loading Sheehan's personal property, such as his television, radio, and VCR, into his PT Cruiser.

Petitioner, Franklin, and Laws unsuccessfully attempted to pawn the property, but Petitioner did leave the handgun with a woman to hold until he returned. Petitioner then instructed Franklin to sell the ring he had taken off of Sheehan, which Franklin did for $100. After Petitioner unsuccessfully attempted to obtain a U-Haul truck to remove more items from Sheehan's house, the group went to a 7-Eleven store where Franklin entered by herself and purchased alcohol. Petitioner then retrieved the handgun from the woman he had left it with and he began pointing it at Franklin and threatening to kill her if she talked about what had happened to Sheehan. Laws told Petitioner that he should kill Franklin.

When they returned to Sheehan's house, Petitioner ordered Franklin to come inside. While she was in the shower, Laws came in with Sheehan's pet iguana impaled on a butcher knife. Laws then asked Petitioner if he could cut out Sheehan's eyes or shoot him, but Petitioner said no. Petitioner and Laws began kicking Sheehan's body and Laws cut off his penis with the butcher knife. The group then began loading more of Sheehan's items into the PT Cruiser. Franklin testified that Petitioner and Laws took turns watching her throughout the night.

The next morning, the group went to visit "Pookie" who was a friend of Petitioner. Pookie allowed Petitioner to store the items taken from Sheehan's house at his apartment, as Petitioner claimed that the items were his and that he needed a place to store them because he was having a fight with his wife. Petitioner also gave Pookie the gun. After Petitioner told Franklin to keep her mouth shut about what had happened, she was allowed to take the bus home, while Petitioner and Laws stayed at Pookie's apartment.

     Before she arrived home, Petitioner and Laws caught up to Franklin. They told her she had to drive them back to Sheehan's house. The group took more items from the house and Petitioner instructed Franklin to get them a room at the Days Inn. Petitioner had retrieved the gun from Pookie. Franklin testified she never tried to leave that night. The following day the group split up, with Petitioner reiterating to Franklin that she should keep her mouth shut about what had happened.

     <u>The investigation and additional trial testimony</u>

     Sheehan's body was discovered on January 12 by his brother Tim. Numerous officers from the Fresno Police Department arrived at the scene and walked through the residence with Tim Sheehan. The house had been ransacked and was in complete disarray. The furniture had been moved, clothes and furnishings were piled on top of the dining room table, pictures and large mirrors were removed from the walls, and large stereo speakers had been moved into the family room. A 64-inch big screen television, which weighed about 200 pounds, had been partially moved and all the wires and cables were disconnected. A newspaper wrapped in plastic was in the fireplace and the plastic and paper were charred. An aquarium in the kitchen which had housed a pet iguana was cracked, and there was blood on the broken glass. A bloody napkin and empty bottles of wine and Old English malt beer were in the kitchen garbage. Tim Sheehan informed the police that several items were missing from his brother's house, including a camcorder, a VCR, a boombox stereo, a small television, several Franklin Mint figurines, a Glock semi-automatic handgun, and a shotgun. John Sheehan's new PT Cruiser and his garage door opener were also missing.

     There were blood drops on the patio near the pool and partial shoe tracks in the blood. A broom was floating in the pool and another broom was leaning against a patio pillar. A man's shirt was on the patio, and it was covered in blood. A bloody towel was also on the patio. There were blood drops on a rope hammock and glider in the backyard. There were drinking glasses on the patio furniture and blood smears were on the glass. There were three large fragments of broken glass on the patio and very fine glass fragments spread across a large portion of the patio. The recycling bins in the backyard contained Old English malt liquor bottles.

     The police also searched the master bedroom and discovered blood stains in the closet near the floor safe. A bottle of chlorine bleach was found nearby, which appeared to have been used to

wipe off the blood. The closet's top shelf contained live rounds for a nine-millimeter handgun and one live 12-gauge shotgun shell. There was a pellet gun in the living room. Petitioner's fingerprints were found in several locations.

The autopsy revealed that John Sheehan suffered a single gunshot wound in the lower left chest. The bullet was fired from front to back, went through his hand, and continued into his abdomen. The bullet perforated the liver and lodged in his back. A single copper jacket lead bullet was removed from under the skin, near the back. The absence of "stippling" or "tattooing" marks indicated that Sheehan was shot from approximately 24 to 36 inches away, and his hand was probably near his ribs when the shot was fired. Sheehan had suffered numerous blunt force injuries to his head, and lacerations or tears on his scalp and chin. He also suffered a fractured jawbone and bleeding in the area. These injuries were most likely inflicted before he died. The pathologist believed Sheehan could have survived for 15 to 30 minutes after he was shot. The condition of Sheehan's body was consistent with death occurring on January 7, 2001. The pathologist also determined Sheehan suffered several injuries to his body, which were inflicted after he died. There were blunt force injuries to his head, cheek, and hip. In addition, Sheehan's penis and part of the scrotum skin had been cut off with a knife.

There were widespread media reports about Sheehan's missing green PT Cruiser, and the police asked for the public's help in trying to locate the vehicle. On Friday, January 12, 2001, Officer Jessie Herring received a dispatch that a green PT Cruiser was parked near Huntington and Barton. Officers Herring and Kim responded to the area and found Sheehan's car. Officer Kim interviewed 11-year-old J.M., who lived in the vicinity. J.M. stated he had seen a tall African-American man and a short, skinny African-American woman park the car a few days earlier, possibly on Wednesday. The man was driving and the woman was the passenger. J.M. stated they left the car and walked down Kings Canyon toward McDonalds. Martha Perez also lived in the area and testified the PT Cruiser had been parked on the street for two or three days before the police found it on Friday.

The PT Cruiser was towed and examined by the police. A live shotgun shell was found under the mat in the back passenger side. The shotgun shell was very similar to the shell found in Sheehan's house. A trigger guard from a Mossberg shotgun was on the floorboard of the driver's

side.

On January 15, 2001, Bobby Hunt contacted the police department and reported he had seen the green PT Cruiser at a 7-Eleven store at Clinton and West. Hunt still had his store receipt and determined that he saw the car at 2:47 p.m. on Monday, January 8, 2001, and that there were two black males and a black female with the car. The female got out of the car and paid for something in the store. The police obtained the store's surveillance videotapes and still photographs which depicted Victoria Franklin with Sheehan's PT Cruiser at approximately 2:30 p.m. on January 8. The tape showed Franklin as she entered the store by herself, purchased some items, and returned to the car. The tape also showed the car leaving the parking lot.

Victoria Stidham, who worked at the Fresno Hocke Shoppe, testified that on January 8, 2001, Franklin sold her a ring for $100. The police also obtained a receipt from the Days Inn showing that Franklin registered for a room there on January 9. Pookie and his fiancee testified that Petitioner, Laws, and Franklin came to their apartment and asked if they could store property there and that Petitioner asked for a bandage because he had cut his finger on some glass.

<u>Petitioner's pre-trial statements</u>

When initially questioned about Sheehan's murder by Detective Garcia, Petitioner claimed that he knew nothing about it. However, when Garcia said that Sheehan's head had been split open and that some "bad stuff" had been done to his body, Petitioner replied, "I know. It's true." Petitioner eventually admitted that he had been to Sheehan's house and that he had hit him in the head with a bottle because Sheehan disrespected him by using the "N-word." Petitioner further acknowledged that he was in Sheehan's car several times, that he stayed at the Days Inn with Franklin, that he was at the pawn shop when the ring was sold, and that he helped moved some property into Pookie's apartment.

**DISCUSSION**

**I. Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).  Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

**II.  Legal Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding."  28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III.  Review of Petitioner's Claims**

    **A.  Ground One**

Petitioner claims that California law does not allow a conviction based on the uncorroborated testimony of an accomplice and that it requires that an accomplice's testimony be viewed with distrust.  Petitioner argues that his rights were violated when the trial court instructed the jury that it must decide whether Victoria Franklin was an accomplice rather than instructing that she was an accomplice as a matter of law.  Petitioner further argues that, to the extent his counsel agreed to the improper instructions, he provided ineffective assistance.

These claims were presented in an appeal to the California Court of Appeal, which affirmed the relevant portion of the judgment on May 19, 2003.  (Lodged Doc. 4.)  The issues were then raised in a petition to the California Supreme Court, which summarily denied review.  (Answer at 5; Lodged Doc. 5.)  The California Supreme Court, by its "silent order" denying the petition, is presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting Petitioner's claims, the Court of Appeal found that the instructions were not improper because there was conflicting evidence as to whether Franklin acted as an accomplice.  The court further found that any error in failing to instruct the jury that Franklin was an accomplice as a matter of law was harmless, as there was overwhelming evidence to corroborate Franklin's testimony.  (Lodged Doc. 4 at 42-49.)  For the same reasons, the court determined that Petitioner's counsel was not ineffective.  (Id.)

    1.  Instructional error

To obtain federal habeas relief on the basis of an incorrect jury instruction, a petitioner must show more than that the instruction was undesirable, erroneous, or even universally condemned; the question is whether the instruction by itself so infected the entire trial that the resulting conviction violated due process.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991)  "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."  Id.  Further, habeas relief based on trial error is only available if the error had "substantial and injurious effect or influence in determining the jury's

verdict." Calderon v. Coleman, 525 U.S. 141, 145 (1998); see also Inthavong v. Lamarque, 420 F.3d 1055, 1059 (9th Cir. 2005) ("To grant relief where a state court has determined that a constitutional error was harmless, we must both determine (1) that the state court's decision was 'contrary to' or an 'unreasonable application' of Supreme Court harmless error precedent, and (2) that the petitioner suffered prejudice under *Brecht* from the constitutional error.").

The state court's determination that the instructions did not violate Petitioner's rights was not unreasonable, as the evidence presented was conflicting as to whether Franklin acted as an accomplice. See People v. Hayes, 21 Cal.4th 1211, 1272 (1999) ("[A]ccomplice status is a jury question unless there can be no reasonable dispute as to the facts or the inferences to be drawn therefrom."); People v. Williams, 16 Cal.4th 635, 679 (1997) (citations and quotation marks omitted) ("Whether a person is an accomplice within the meaning of section 1111 presents a factual question for the jury unless the evidence permits only a single inference. Thus, a court can decide as a matter of law whether a witness is or is not an accomplice only when the facts regarding the witness's criminal culpability are clear and undisputed."). Franklin testified that Petitioner repeatedly threatened to harm or kill her, including making threats while pointing a gun at her, if she tried to leave or if she told anyone what had happened. She also testified that Petitioner and Laws physically prevented her from leaving. While other evidence contradicted Franklin's claims that she was forced to participate in the crimes, such as the fact that she had opportunities to obtain help or escape but did not, the evidence that she was an accomplice was not so overwhelming that due process required instructing the jury that she was an accomplice as a matter of law. See People v. Hoover, 12 Cal.3d 875, 879 (1974) (stating that an accomplice must act with "guilty knowledge and intent with regard to the commission of the crime"); People v. Garrison, 47 Cal.3d 746, 772 (1989) (finding no error in failing to give the "accomplice as a matter of law" instruction where witness's testimony that he only aided the burglary because he feared for his life suggested he lacked the requisite intent).

The state court's determination that any error in the instructions was harmless was also not unreasonable, as there was a significant amount of evidence corroborating Franklin's testimony. This evidence included that the house had been ransacked and items were missing, that there were glass shards and blood stains on the patio, that the aquarium was broken and the iguana was missing,

and that the pathologist confirmed that Sheehan suffered injuries consistent with Franklin's testimony. Witnesses and surveillance tapes also corroborated Franklin's testimony relating to the group's visit to the 7-Eleven store, the pawning of the ring, the fact that items were stored at Pookie's apartment, and the abandonment of Sheehan's PT Cruiser. Further, Petitioner's own pre-trial statements corroborated much of Franklin's testimony regarding the sequence of events prior to and following Sheehan's death.

### 2. Ineffective assistance

In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S. 668, 687 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different." Strickland, 466 U.S. at 694.

The state court's determination that counsel was not ineffective was not unreasonable. As the evidence was not sufficient to require an instruction that Franklin was an accomplice as a matter of law, counsel was not deficient in failing to insist on such an instruction. Further, Petitioner has not shown a reasonable probability that the result would have been different if counsel argued for the use of the instruction, as Franklin's testimony was substantially corroborated by other physical evidence and testimony.

### B. Ground Two

Petitioner, while acknowledging that the evidence was sufficient to convict him of second-degree burglary, argues that there was insufficient evidence to support his convictions for first-degree burglary. Petitioner's claim, however, is moot as the California Court of Appeal resolved the issue

in favor of Petitioner, ordering that the convictions for first-degree burglary be reduced to second-degree burglary and remanding for resentencing. (Lodged Doc. 4 at 34-42.)

### C.  Proper Respondent

Petitioner states that he is currently incarcerated at Corcoran State Prison. (Petition at 3.) Respondent states that the warden of that institution is Derral Adams. (Answer at 2.) Pursuant to Rule 25 of the Federal Rules of Civil Procedure, the Clerk will be directed to substitute Derral Adams as Respondent in this matter.

### RECOMMENDATION

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

### ORDER

The Court HEREBY ORDERS that the Clerk of Court is DIRECTED to substitute Derral Adams as Respondent in this matter.

IT IS SO ORDERED.

**Dated:    July 7, 2008**                    **/s/ John M. Dixon**
                                         UNITED STATES MAGISTRATE JUDGE